## No. 9766.

### HENRY SINGER VS. CARONDELET CANAL AND NAVIGATION COMPANY AND BERTRAND SALOY.

The Carondelet Canal and Navigation Company have, and its predecessors had, a perfect right to use, appropriate and enjoy the property adjacent to Bayou St. John and Canal Carondelet, on either side, for the purpose of facilitating their operations in the improvement of navigation therein, as contemplated in their several charters.

Among their chartered rights are the construction and maintenance of roads on either side and collection of tolls thereon; to take and receive from each passing vessel toll, according to her tonnage; to prevent any person from using the same in any injuriously to them, or embarrassing to commerce.

No one can derive any adverse right of possession or ownership to any property adjacent to said bayou or canal from the State, by a title subsequent in date to the Navigation Company's charter; because the State, in such case, would be the common author.

Having the exclusive right, under its charter, to the use of the banks or shores of the Bayou St. John and Canal Carondelet, for its operation for the purpose of navigation, no one has the right to establish a ferry, for the conveyance of passengers, across the same without permission of the defendants; and when such permission is given by them, on the condition that it shall not impede navigation thereon, it may be recalled when ascertained to be inconvenient and a hindrance to vessels.

APPEAL from the Civil District Court for the Parish of Orleans. *Tissot*, J.

---

*J. Duvigneaud* and *Posey & Ker* for Plaintiff and Appellee.

*H. D. Ogden* for Defendants and Appellants.

---

The opinion of the Court was delivered by

WATKINS, J. The plaintiff claims to be the owner and proprietor of the establishment called "Over-the-Rhine," situated on the right bank or shore of Bayou St. John, opposite Spanish Fort, near its entrance into Lake Pontchartrain; and he also claims to be the owner,

in possession, of the land upon which those improvements were erected, down to the water's edge.

He represents that, in order to afford his patrons facilities for visiting his place of refreshment and public resort, and thereby to make his business more profitable, he is lawfully using and running over and across said bayou, in front of his said establishment, a flat propeller by means of a small rope; which flat he and his predecessors have been thus using and propelling, legally, publicly and peaceably for a long time, with great profit and advantage to his and their said business.

He avers " that said Bayou St. John is a " *natural navigable stream ; free* to the use of the inhabitants of the country, and not the *private* property of any individual, or set of individuals, and that, in using it, as aforesaid, he has never, at any time, or in any manner, interferred with the rights of any other person, or the public in general, to the enjoyment or use of said bayou or its banks."

He further shows that Bertrand Saloy, acting as the president of the Carondelet Canal and Navigation Company, has, without any warrant of law, or color of chartered right, undertaken to prevent him from running and using said flat; and has, by force and violence prevented him from so using and operating the same, to his great and irreparable injury and damage; and that he has illegally blocked up said bayou with logs, so as to prevent the crossing of said flat.

He further represents that said company, through its said president, has unlawfully appropriated to its own use, and is actually using a part of his land as a wood-yard, and has thereon erected one or two small buildings, dedicated to the uses of said company, without his consent or authority, and to his great injury and inconvenience.

He claims that by reason of defendant's illegal and tortious acts he has suffered $2500 damages, for which he prays judgment.

He also prays judgment perpetuating his injunction against their continuance, and to compel defendants to remove the obstructions complained of as interfering with his ferry rights and privileges.

Defendant company excepted to the insufficiency of the averments of the petition to support the judgment prayed for; that the plaintiff disclosed no right in himself to establish a ferry, to be operated by means of a rope stretched across Bayou St. John; that his petition does not set out the description of the land he claims; that, at the time he claims to have acquired certain property from Otto Touché, there was a similar suit, then pending between Touché and themselves, involving *his* right to operate said ferry, and that judgment was rendered there-

in shortly after, dismissing it in so far as they were concerned, and that said suit and judgment forms a complete bar against plaintiff's demand therefor.

These exceptions having been overruled, the defendant company answered as follows :

That by virtue of the several legislative charters granted to it and its predecessors in 1805, 1857 and 1858, it has and had full authority to take possession and control of Bayou St. John, and has had full, entire and complete management and control of navigation therein, since said charters were granted.

That it has power and authority to make rules and regulations for the government and control of same; to direct where vessels and other crafts shall land, and to prevent and remove any obstructions that may impede, injure or interfere with their navigation thereof.

That plaintiff is, and was without right or authority to stretch a rope across the bayou, and to use it as he has done; and that its said use is an obstruction to the navigation thereof, occasioning hindrances, delays and accidents to vessels and other water-craft.

That plaintiff is not the owner, and is not entitled to the use of the land to the water's edge, but that by its aforesaid charters it is entitled to, and is the owner of, the banks of said bayou, and twenty feet additional, specially granted it, on either side, for the construction and maintenance of public roads.

That for over forty years it has kept enclosed, by means of a fence running parallel with the bayou—and at a distance of sixty feet therefrom—the land between said fence and the bayou.

That, at their own expense, the company has erected and maintained a bulkhead in the edge of the water, and have filled the intervening space between it and the top of the banks, whereby a new and permanent bank of some fifteen feet in width has been and is now in use.

That since 1805, it and its predecessors have been in the peaceable, open and undisputed possession and enjoyment of said land, and they plead the prescription of ten and thirty years.

That plaintiffs' action and injunction were causeless and without the color of legal right, and $500 is due them on the score of attorneys' fees.

Bertrand Saloy denies any individual liability, and joins in the company's answer and demands.

I.

In order to a proper understanding of the issues involved, it will be necessary that a brief history be first given of the Navigation Company and its chartered rights and privileges.

In the latter part of the eighteenth century, Bayou St. John was quite a small stream. At the point of its confluence with Lake Pontchartrain there was formed a sand-bar, and the water was so shallow at times that a canoe could not pass its mouth.

During the administration of Baron Carondelet in 1790, the opening of a canal through Bayou St. John, from the lake to the city, was first undertaken; but it was not completed under the Spanish *regime*.

After the cession of Louisiana and the establishment of the Territory of Orleans, provision was made by the Legislature for its completion; and the "Orleans Navigation Company" was organized under an act for the purpose of improving the inland navigation of the territory, which was approved on July 3, 1805.

Power was conferred upon that corporation to "enter into and upon, all and singular, the land, and *lands covered with water*, where they shall deem it proper to carry the canals and navigation herein before particularly assigned, with or without the consent of the owners thereof; and to lay out such routes and tracks as shall be most practicable for *effecting navigable canals*," etc.

It further provided for the expropriation of private property adjacent to the proposed canals, "not to extend more than one hundred and eighty feet therefrom;" declaring that said corporation, and its successors, on paying the award therefor, "shall be immediately vested with a good and *indefeasible title to the said lands and tenements*," etc.

The corporation was authorized to have and recover from every passing vessel, inward or outward bound, one dollar per ton of such vessel's admeasured burthen, as soon as it should so improve the navigation of Bayou St. John as to admit, at low tides, vessels drawing three feet of water; and when it was further improved, so as to permit such vessels to pass from said bayou by the Canal Carondelet to the bayou terminating the same at the city, it should be entitled to receive from such vessels one additional dollar per ton, etc.

The act further declared that if any one should break, or throw down any embankment, or other work erected by said corporation; or should forcibly pass through any of said canals, such person, besides repairing all damage occasioned thereby, should forfeit and pay the sum of $100, and in addition to toll.

The company was authorized to lay out and construct, from the bridge at the Bayou Settlement—now Spanish Fort—a road or highway on each side of the bayou; and, if same was constructed of shells, sand, or other hard material, and of at least twenty-five feet in width, it was entitled to charge toll, the rate of which was fixed.

31

In 1821 suit was brought by the Attorney General to determine the constitutionality of the company's charter, and after full discussion and careful consideration its validity was maintained. 11 O. S. 309, State vs. Orleans Navigation Company.

This corporation continued operations under its charter until 1852, when suit was again instituted in behalf of the State, for the forfeiture and revocation of its charter, on the ground that it had become insolvent, and through neglect and mismanagement of its affairs, the navigation of the Bayou St. John and Canal Carondelet had become dangerous and hazardous.

This suit prevailed, and its charter was revoked and forfeited " for a violation of the conditions of the act of incorporation." 7 Ann. 679, State vs. Orleans Navigation Company.

During the pendency of that litigation the Legislature of 1852 enacted a statute authorizing, in the event of its successful termination, the liquidation of the company's affairs; the sale of " all its property, real and personal, in block, at public auction, to the highest bidder." There was made in it a condition that if the purchasers should organize themselves into a corporation, under the laws of the State, for a term of twenty-five years, for the purpose of carrying out and effecting the improvements originally contemplated, and the construction of a new basin, at the junction of Canal Carondelet and Bayou St. John, said corporation should be entitled to receive and exact all such tolls and revenues for the use of said canal, bayou and roads as the Orleans Navigation Company was entitled to under its charter.

Thereunder a sale was made on the 28th of June, 1852, to James Currie and others, of all the rights, privileges, franchises and property of the Orleans Navigation Company, to, in, or upon Bayou St. John and Canal Carondelet, together with all of its dependencies and accessories of any and every kind, especially including all those acquired by said company under various acts of Congress.

Subsequently there was duly organized the New Orleans Canal and Navigation Company, which acceded to all the rights of said purchasers, under the aforesaid legislative enactment; and they entered into immediate possession and control, and continued, uninterruptedly, in possession and control, and full enjoyment of their rights until 1857, when same were transferred to the Carondelet Canal and Navigation Company, defendant herein, which was incorporated by the Legislature of that year. It was, by the terms of its charter, expressly empowered to complete the work of improvement theretofore

begun on Canal Carondelet and Bayou St. John, by its predecessors; to take possession of same, and " to receive, possess, hold and enjoy all and singular, the rights, franchises, privileges, powers and authority, which were, at any time, granted to, received, possessed, enjoyed or exercised by the late Orleans Navigation Company," etc.

In 1877 the right of the defendant company was resisted on the ground that Bayou St. John is a *natural navigable* stream, emptying its waters into Lake Pontchartrain and connected with the Gulf of Mexico, and is, therefore, public, and free to all persons whomsover, to navigate it at pleasure, with their vessels, and to moor them to its bank; but the Court decided differently, and held that it was not a " *natural navigable* stream," but had been *rendered navigable* by the labor, skill and capital of the defendant company, and its predecessors. 29 Ann. 430, Carondelet Canal and Navigation Company vs. Parker.

In this manner, the defendant company traces—through the various charters, deeds and legislative enactments recited—its title and franchises to and upon the land, bayou, roads and canal, in controversy, back to the original incorporation of the Orleans Navigation Company in 1805.

There appears to be no broken link in the chain. All of its rights and titles descended to it directly from the Territorial and State governments. No part of the property ever passed under parochial or municipal control. The defendant company acquired, and is the owner of all the rights of its predecessors, whatever they were—the right of use or property—in the banks of Bayou St. John to the extent of 180 feet, on either side. If they did not acquire an absolute title to the land, at the date of the grant—because the fee was, at that date, in the United States government—the title vested in the corporation, by the acts of 1852 and 1857. If these be regarded as questionable, it is certainly true that the State could not thereafter dispose of any part of the territory traversed by the canal, bayou and roads, to an other, and free it from the claims of the corporation, under its charter.

## II.

The record shows that plaintiff acquired February 3, 1885, an apparent title, at sheriff's sale, under execution against one Otto Touché, to all his right, title and interest in and to fractional section ten, of township twelve, range eleven, south, containing four and sixty-seven one hundredths acres.

Otto Touché acquired from J. R. Bres on February 3, 1884.

Bres obtained a patent from the State on the 23d of November, 1882.

This land was selected and reported to the Surveyor General of the State as swamp and overflowed land, on the 18th of April, 1850.

The fee simple was in the State in 1852, when the sale to Currie and associates was made, and when the New Orleans Canal and Navigation Company was organized.

The record further discloses that on the 9th of March, 1880, Otto Touché accepted a written lease from the defendant company, of a certain piece of ground, measuring 100 to 120 feet front on Bayou St. John, for the purpose of erecting a house thereon, to have a front of 100 feet and a depth of 18 feet. This lease was for a period of one year from the 1st of April, 1880, with the privilege of another year, and at the rate of $25 per month.

There was an express stipulation in the lease that at the expiration thereof the buildings thus erected should *revert*, with the property of the lessors, without any reservation or additional consideration.

Soon after this lease was executed Bertrand Saloy, acting for the company, granted his lessee permission to make use of ferryboats in transferring persons across Bayou St. John by means of a rope stretched from bank to bank, upon the expressed condition that it should not hinder nor impede the navigation of that stream.

On the 6th of June, 1881, Touché wrote a letter to the defendant company in which he requested them to release him from his obligation to pay for the ferry privilege. He says: "Being a *lessee of yours*, please take into consideration that I have paid you $5 per month for the privilege of the ferry, when boats of twice the size, charging fare, are only paying $2 to $2.50 per month."

On the 23d of August, 1884, the defendant company gave Otto Touche written notice that the privilege granted him to run a flat across the bayou, or any other craft upon its waters, was *withdrawn*.

He denies having received the letter, but a witness swears positively that he handed it to him, and we are inclined to believe his statement, as he is without interest in the suit.

This lease had not expired when Otto Touché acquired a title from Bres, February 3, 1884, and he could not in that manner *dispossess his lessor*, for whom he occupied as agent and lessee; and in direct violation of his contract, he could not acquire the ownership of the *buildings, and the improvements that reverted* to the company at its expiration.

The record further discloses that in September, 1884 - about six months subsequent to his reputed purchase from Bres, and within a few days after the company had revoked his ferry privilege --Otto

Touché instituted a suit, quite similar to the instant one, against same defendants; and it was pending at the time the plaintiff, Singer, caused a seizure to be made of the property in question, and it was dismissed by a judgment of the court only a few days prior to his purchase. Under the circumstances, he could acquire no better or higher right than *his judgment debtor had, at date of seizure of the property, as his.*

It further appears from the evidence that Otto Touché has never yielded the *actual* possession of the property to Singer, who resides in the city; and Touché continues the control and management of the business as before, to *all appearances*, though he claims to represent Singer at a salary of $100 per month.

The following quotations from his evidence illustrates the character of his continued occupancy of the premises:

"Question. Did you draw out of the receipts in the bar-room?

"Answer. Yes, sir.

"Q. Did you keep an account of those receipts?

"A. None, particularly.

"Q. Did you keep any account to show how much you have taken out of the receipts of Mr. Singer?

"A. No, sir.

"Q. You have no books or papers showing that?

"A. No, sir.

"Q. No papers of any kind, or accounts between you?

"A. None, particularly.

"Q. Do you know of Mr. Singer keeping any account of your transactions with him?

"A. I don't know that he does.

"Q. Did you ever render him any account of your transactions with him?

"A. No, sir; not particularly."

Mr. Singer, though present in court during the trial, did not offer his evidence, and favored us with no explanation of this unsatisfactory situation.

Immediately previous to the institution of this suit, Otto Touché made considerable repairs on the buildings, for which he claims to have expended quite a sum of money.

Whatever rights may have been transferred from Bres to Touché, or which subsequently passed to the plaintiff, are here presented in such *questionable* shape as to entitle them to small consideration.

### III.

From the evidence we have gathered the following facts, which serve to show the manner in which the defendant company and its

predecessors dealt with the franchise and properties with which same was connected during a series of years.

One witness states that he has known the lands in controversy for forty years. That in 1852 he worked for the company, and hauled shells and put them on the bayou road. He says that, at that time, the company had a blacksmith shop and wood-yard on the premises in question, and there was a fence running along the bayou, and of about the average distance of sixty feet from it. The company occupied the intervening space between the fence and another bayou, then and since. Says that he owns land in its immediate vicinity, and that it is low, swampy land. That the land where the establishment called "Over the Rhine," is situated, was, at one time, low and swampy; but that has been *raised by the company.* That its mean width, from the bayou to the swamp, is about 60 to 65 feet. Before this land was raised the water from the lake washed across it, at high tide—often being submerged thereby. This land was raised by dirt taken from the bed of the bayou by dredging. The work was done in 1845 or 1846, though it was not entirely filled in 1852.

The company once had a warehouse on the premises, but it was burned down in 1846. Others say that the wood yard, of which the plaintiff complains as a nuisance, is one that has been kept by the company for many years past, as a wooding-place for steamboats. Near it is a small cabin belonging to the company, and which is occupied by officers of the vessels leading through the canal.

Many years prior to the establishment of the improvements Over-the-Rhine, the defendant company had built a break-water in the edge of the water, in front of those premises, and had filled in the space between it and the bank with earth, whereby the bank was elevated, and extended out a distance of about fifteen feet. This was done about 1880; and it was established on or very near the line of the old break-water. The pilings were driven down in the edge of the water, and planks nailed to them, and the dirt was filled in between it and the bank, somewhat after the style of a levee.

There can be no doubt that the defendant company and its predecessors had a perfect and complete right to use, appropriate and enjoy the property adjacent to the Bayou St. John and Canal Carondelet, as they did, and that plaintiff has acquired no right, under his title, which can exclude defendants from the enjoyment of it.

IV.

With regard to the plaintiff's ferry privileges, it is sufficient to say that the only right of that kind, to which defendants ever consented,

was by them *expressly withdrawn* long before he acquired any color of right in the premises.

The evidence shows, clearly and unmistakably, that the rope that was stretched across the bayou, whereby the flat was propelled from side to side, particularly under the loose management of Otto Touché, was a great hindrance and impediment to navigation on the bayou, and defendants had a perfect right to discontinue it. There was a good bridge across the bayou, only a little way from Touché's place of business, which furnished his customers ample facility of reaching his resort; and the company was under no obligation to increase them gratuitously.

Under the general law of the State, the police juries have the "exclusive privilege of establishing ferries and toll bridges within their respective limits;" and they are required to lease them out at public auction. R. S. secs. 2750, 2758.

But as the *locus* in question is within the territorial limits of the city of New Orleans, some consent should have been first obtained from her municipal authority, if, indeed, the same was subject to municipal control.

This identical question was under examination by our predecessors in a case cited above—11 O. S. 324, State vs. Orleans Navigation Company—in which they held:

"As a public highway, the *river* may be freely navigated, *up and down*, for the convenience and for hire, of persons and property.

"*Not so across*, at such points where ferries are established by law, nor within a certain distance above or below them.

"The freedom stipulated for by the ordinance is not so absolute as to be *inconsistent with submission to the ferriage laws*, securing to the citizens residing within or without the territory the convenience of finding at suitable places, at all times, and for a fixed compensation, the means of crossing."

The plaintiff is not only subordinated to the ferriage laws, but *they* are subordinated to defendant's chartered rights and franchises and exclusive privileges on Bayou St. John and Canal Carondelet, and cannot be permitted to evade the same, so as to establish a ferry or to maintain the one hitherto established, without their consent first obtained.

It is, therefore, ordered, adjudged and decreed that the judgment appealed from be annulled, avoided and reversed; and it is now ordered, adjudged and decreed that the demands of plaintiff be rejected and his injunction dissolved, and that the demands of defendants for compensation for attorneys' fees be rejected as nonsuit, and that the costs of both courts be taxed against plaintiff and appellee.